(No. 43394.—

*In re* JULIUS M. LYTTON, Attorney, Respondent.

*Opinion filed May 21, 1971.*

TERRY O. HELMICH, of Springfield, *amicus curiae.*

CROWLEY, GOSCHI & GRIFFIN, of Chicago, for respondent.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The sole question presented in this disciplinary proceeding is the sanction to be imposed upon respondent, Julius M. Lytton, who was in 1968 found guilty by a Federal district court on a plea of *nolo contendere* to an

indictment charging a violation of section 17(a) of the Securities Act of 1933 (15 U.S.C., §77q(a)) and fined $10,000 and costs.

In January, 1969, a complaint based upon this conviction was filed before the Committee on Grievances of the Illinois State Bar Association sitting as commissioners of this court under our Rule 751. (43 Ill. 2d R. 751.) The commissioners found that respondent had been convicted of a crime involving moral turpitude and recommended that he be suspended from the practice of law for one year. Upon review, the Board of Governors of the association approved that report, but recommended a reduced period of suspension of six months and until further order of the court. Respondent contends that the recommended discipline is excessive and inappropriate under the circumstances of this case.

It is well established that conviction of a crime involving moral turpitude is conclusive evidence of an attorney's guilt and is ground for disbarment or other disciplinary action. (*In re Revzan*, 33 Ill. 2d 197; *In re Sullivan*, 33 Ill. 2d 548; *In re Greenberg*, 21 Ill. 2d 170; *In re Eaton*, 14 Ill. 2d 338; *In re Teitelbaum*, 13 Ill. 2d 586.) It is equally well settled that final responsibility for determining the discipline to be imposed rests in this court and that in determining an appropriate penalty we may properly consider all facts and circumstances in aggravation and mitigation, including respondent's actual conduct. *In re Shavin*, 40 Ill. 2d 254; *In re Sullivan*, 33 Ill. 2d 548; *In re Crane*, 23 Ill. 2d 398.

In the latter part of 1959, Glen A. Jordan, a client of respondent, contacted him with reference to organizing an insurance company. As a result, Jordan and respondent went to Little Rock, Arkansas, to discuss the formation of an insurance company with Jordan's uncle, Earl Hudgens, who was the president of a successful insurance company. Initially, Hudgens was skeptical due to the lack of experi-

ence of Jordan and respondent, but after several additional meetings, he agreed to join in the formation of the proposed company if he and his attorney, John Shamburger, would have an interest in the enterprise. Shamburger was general counsel and management consultant for 10 life insurance companies and, according to Hudgens, was an expert in the securities field and in forming insurance companies. In the early part of 1960, the respondent, Jordan, Hudgens and Shamburger (the principals), held their first organizational meeting in Chicago. At this meeting, Shamburger agreed to prepare the necessary papers for the organization of the insurance company and a securities company which would sell the insurance company stock. He also agreed to prepare the prospectus and an "outline of the insurance company in the way it was supposed to work." Shamburger met with respondent and Jordan a number of times prior to the filing of the prospectus with the Illinois Insurance Department. As a result of discussions between the principals and an attorney employed by the Department, substantial changes were made in the original prospectus, and it was approved on March 23, 1960.

The principals were equal owners of the Quad-Cities Securities Corporation from its organization in February, 1960, until they sold their interest in March, 1962. Quad-Cities sold Republic Investor Life Insurance Company (RILI) shares as its exclusive agent on a best efforts basis and received a 15% commission.

RILI's Articles of Incorporation authorized issuance of 1,250,000 shares. Its original offering of 1,000,000 shares was sold to Illinois residents at $4 per share under pre-organization subscription agreements. The shares so offered were restricted in that they could not be sold or otherwise disposed of for a period of 30 months from July 14, 1961, (the date RILI was authorized to commence writing policies) unless first offered to RILI or a desig-

nated securities dealer (Quad-Cities) at the original price plus 1% per month for each month the subscriber had retained ownership. Quad-Cities was empowered to resell all shares so acquired. This restriction was allegedly designed as an insurance sales technique whereby "a captive market" of potential insurance buyers and community contacts for the sale of insurance policies would be created.

At the first meeting of the shareholders in August, 1961, the Board of Directors was elected and a 4-for-1 stock split approved by the stockholders. The stockholders also approved a stock subscription plan under which each of the principals received the rights to 160,000 previously unissued shares at $1 per split share under subscription agreements which provided for payment within five years without interest. The stock subject to these subscription rights was not restricted as to sale or transfer although the unrestricted nature of the principal's subscription shares was not disclosed. Respondent testified that he was not aware that his stock subscription rights were unrestricted until March, 1962. Between March, 1962, and October, 1962, respondent repeatedly sold these subscription rights to Quad-Cities at prices up to $6.75 per split-share. During this period 40,575 rights were transferred for which respondent received approximately $184,000. In August, 1963, he sold an additional 550 shares at $9 per share through Republic Securities Company. Throughout this period the most an original subscriber could sell his stock for would be $1 per split share plus 1% per month interest.

In the later part of 1963 the principals' continued control of RILI was threatened by a proxy fight and a number of lawsuits. At the suggestion of the Insurance Department the principals consulted with W. McNeil Kennedy, an experienced attorney in the securities field who, following an investigation, indicated that the issuance to themselves and sale by the principals of the unrestricted stock might well be a violation of the Securities Act. Ac-

cordingly, he recommended a rescission offer under which the principals would repurchase the unrestricted stock sold by Quad-Cities between November 4, 1961, and November 7, 1962, at the original purchase price plus 5% interest. This offer of rescission was filed with the Securities and Exchange Commission on March 26, 1965, and approved November 10, 1965, the same date on which Federal grand jury subpoenas were served on certain officers of RILI. On June 2, 1966, respondent was indicted by a Federal grand jury. Kennedy testified that in his 30 some years experience with the Commission there had never been an indictment where an offer of rescission had been made and accepted.

Respondent's principal contention is that a comparison of the mitigating circumstances present in the instant case with those considered by us in *In re Crane*, 23 Ill. 2d 398, in which censure was deemed to be an appropriate discipline, indicates that the six-month suspension recommended by the Board of Governors is excessive. In *Crane* we found that in determining the discipline to be imposed upon an attorney convicted of income tax evasion, it was proper to consider "the fact that the Federal judge suspended imposition of sentence and placed respondent on probation conditioned upon his paying a fine of $10,000 and costs, that such fine and costs have been paid, that respondent's practice of law has suffered appreciably, that no assessment has been made against respondent with respect to his civil liability for income taxes for the years in question, that a number of witnesses, including practicing attorneys and sitting judges, testified that respondent's reputation in his community was that of an honored and respected member of the Illinois bar, that no other disciplinary measures have been brought against respondent, and that no proceeding has been brought to disbar him from practice in the Federal courts." *Crane*, at 401.

In addition to the presence of the same mitigating fac-

tors, respondent emphasizes his "mistaken reliance" upon Shamburger, the absence of fraudulent intentions or evil motivation, and his expenditure of approximately $313,000 in connection with the offer of rescission. While it is apparent from the record that respondent relied to a considerable degree upon the alleged expertise of Shamburger, it is clear that respondent played a prominent and active role in the organization and operation of the insurance company. He was one of RILI's promoters and incorporators, a director of the corporation, its general counsel and vice-president, and chairman of the investment committee from the company's inception through 1965. Under these circumstances we agree with the report of the Hearing Division that "at best * * * [respondent] knew, or as an experienced attorney, he should have known, that he was engaged in a fraudulent scheme which violated the law, but which resulted in a profit to him from March 17 through October 25, 1962, of some $184,000."

Finally, relying upon *In re Sullivan*, 33 Ill. 2d 548, respondent urges in mitigation that his indictment and conviction were obtained in violation of an "informal voluntary disclosure policy" of the Securities and Exchange Commission whereby an approved rescission offer would avoid indictment and prosecution. This contention is based largely upon the testimony of Kennedy that, in his experience with the Commission, criminal prosecution was never initiated once an offer of rescission had been approved. Respondent argues that he and the other principals relied upon this alleged "informal voluntary disclosure policy" in supplying the information solicited by the Commission in connection with the offer of rescission. We note, however, that neither Kennedy nor the respondent testified that the Commission had announced any such disclosure policy or otherwise indicated that approval of the rescission offer would stay criminal investigation or indictment. The respondent and the other principals were given the

constitutionally required warnings by Commission officials, and we find no evidence of a policy, either formal or informal, affecting the use of any further disclosures as a basis for criminal prosecution.

Having considered all the extenuating circumstances, including the favorable testimony relating to respondent's reputation for honesty and integrity, we find that suspension from the practice of law for six months is an appropriate form of discipline, and it is so ordered.

*Respondent suspended.*